


**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **VS.** | § | **CRIMINAL ACTION NO. L-12-10** |
| | § | |
| **JOSEPH MICHAEL JONES** | § | |
| **CHRISTOPHER CATES** | § | |

## ORDER

Defendants JOSEPH MICHAEL JONES and CHRISTOPHER CATES have filed a Motion to Suppress (Dkt. No. 30) any evidence resulting from a stop of their vehicle conducted by Border Patrol agents along U.S. Highway 83 near the Zapata-Webb County line the night of December 6, 2011.[1] Invoking the "fruit of the poisonous tree" doctrine as the basis for suppression, Defendants contend that the traffic stop was an unlawful seizure under the Fourth Amendment. The Court has considered the evidence presented at a hearing held in this matter, the parties' briefs (Dkt. Nos. 30, 34, 47, 48), and the applicable law. Based on the foregoing, Defendants' Motion to Suppress (Dkt. No. 30) is hereby DENIED.

### I. FACTUAL BACKGROUND

A suppression hearing was held before the undersigned on January 30, 2012. At the hearing, the Government called as witnesses the two Border Patrol

---

[1] Defendants stand charged of conspiring to possess and possessing with intent to distribute marijuana. Dkt. No. 20. The Indictment alleges unlawful conduct on two specific dates, May 4, 2011 and December 6, 2011. Defendants' Motion to Suppress goes only to the alleged conduct taking place on December 6th.

agents who conducted the roving patrol stop at issue, Agent Luis Garcia[2] and Agent Miguel Lopez.[3] The Government also called Immigration and Customs Enforcement Special Agent Jose Dugger,[4] who was involved with the investigation of this case just before the stop occurred. Based on the evidence offered at the suppression hearing, the Court makes the following factual findings.

On December 6, 2011, Agents Garcia and Lopez were on roving patrol along Highway 83 in the vicinity of Dolores Creek, located in Zapata County about six miles south of the Webb County line.[5] Agent Garcia parked the agents' marked patrol vehicle perpendicular to Highway 83, where they proceeded to monitor traffic. At around 8:30 p.m. they heard a radio broadcast from agents at the Zapata station. The broadcast relayed ICE intelligence on a dually[6] traveling north on Highway 83 and possibly in tandem with other

---

[2] Agent Garcia has served the majority of his six year term with Border Patrol in New Mexico. At the time of the stop, Agent Garcia had been assigned to the Zapata, Texas area of responsibility for about one month.

[3] Agent Lopez has served with Border Patrol for three and a half years, assigned the entire time to the Zapata area.

[4] Agent Dugger has served with ICE for about three years. Although he is assigned to the Laredo area, Agent Dugger works primarily out of Zapata.

[5] The portion of the highway running through this area roughly parallels the Rio Grande River, which acts as the natural border with Mexico. Because of the river's twists and turns, the border at some points will be no further than half a mile from the highway.

[6] A "dually" refers to a pickup truck with two sets of wheels on the rear axle.

vehicles.[7] Soon after the broadcast, the agents observed a Dodge dually pass their position. Traveling about one car length in front of the dually was a white, Dodge four-door flatbed truck.[8]

The flatbed piqued the agents' suspicions. The agents testified that flatbeds are commonly used by workers who service the many oilfields in the Zapata area. But according to Agent Lopez, the trend among drug and alien smugglers in the area has been to use "flatbeds or pickup trucks or anything that will disguise itself as a work truck, oilfield truck," in their smuggling operations. Based on the circumstances here, the agents believed that the flatbed they observed was disguised as an oilfield truck. For one, the agents found this particular flatbed to be unusual because it bore no oil company logo on its side door. The agents also found it unusual that such a vehicle would be out on the highway so late in the evening. These vehicles, according to the agents, are normally seen on the highway in the early morning and late afternoon hours, when oilfield workers are traveling to and from work. Furthermore, because of the short distance between the flatbed in front and the dually behind, it appeared to the agents as if the two vehicles were traveling in tandem. The agents testified that this was indicative of a two-vehicle technique used by smugglers whereby one vehicle acts as a scout or decoy for the other carrying contraband.

---

[7] This intelligence was from Special Agent Dugger, who encountered the dually on his way home from Zapata to Laredo.

[8] A "flatbed" is a utility truck with an open platform at the rear.

The agents decided to investigate further so they followed the vehicles north. Not long after the agents began to follow, Border Patrol Agent Cesar Gomez overtook them on the highway and effected a roving patrol stop of the dually. An inspection of the dually by Agent Gomez did not yield any contraband. Meanwhile Agents Garcia and Lopez caught up to the flatbed. At this point the agents noticed that the flatbed was not carrying any tools or machinery, which they testified was also unusual for oilfield trucks in the area.

Agent Garcia pulled close enough to the flatbed that Agent Lopez could read its Oklahoma-issued license plate. The flatbed slowed from 65 mph (the speed limit) to about 45 mph. Agent Garcia slowed as well and kept behind the flatbed by about a car length. Agent Garcia testified that, with the lights of oncoming traffic shining through the cabin of the flatbed, he could see the driver "fidgeting," or turning around to look at the agents' vehicle. This caused the flatbed to swerve within its lane of traffic. Agent Lopez proceeded to radio a request for a records check of the license plate number. After about eight minutes, the agents received a return. Dispatch indicated that there was no record on file for the license plate number. This indicated to the agents that the flatbed bore false license plates.

Based on their observations and the license plate report, the agents decided to stop the flatbed and conduct an immigration inspection of its occupants. Nearing the highway exit for Rio Bravo, Texas, the agents activated their patrol vehicle's overhead lights. In response, the driver of the flatbed took the Rio Bravo exit and pulled over to the side of the road.

Agent Garcia parked behind the flatbed and exited the patrol vehicle. Agent Lopez stayed behind to rerun the license plate check. At some point after activating their overhead lights, the agents realized that Agent Lopez had misread the license plate number—mistaking the letter "I" in "526HIH" for a number "1."[9] *See* Gov't Ex. 5. Agent Lopez called in the correct license plate number, and, after about three minutes, dispatch advised that the flatbed was registered to two individuals, one of whom was Defendant Jones.[10]

While Agent Lopez reran the plate, Agent Garcia approached the flatbed from the driver's side and proceeded with an immigration inspection. The flatbed was occupied by Jones (the driver) and Cates (the front passenger). Upon Agent Garcia's request, Jones and Cates produced, respectively, Oklahoma and Texas photo identification. While inspecting their identification, Agent Garcia detected the odor of air freshener, which he described as "overwhelming." In his experience, smugglers use air freshener to mask the smell of contraband.

Agent Garcia then questioned Jones and Cates about where they lived and worked. The two men claimed to work as welders for Chesapeake Oil in Zapata. This claim seemed odd to Agent Garcia given the lack of equipment on

---

[9] According to Agent Garcia, the agents discovered the mistake after they activated their overhead lights but before the flatbed came to a complete stop. Agent Lopez testified that they discovered the mistake once the two vehicles were stationary. But as discussed below, this discrepancy makes no difference for purposes of the Court's reasonable suspicion analysis. See *infra* note 12.

[10] Based on Agent Lopez's experience, oilfield vehicles are usually registered to oil companies rather than individuals.

the flatbed. Agent Garcia asked Jones if he could search the flatbed. Jones consented and turned on the cabin light upon Agent Garcia's further request.

Simultaneously, Agent Lopez exited the patrol vehicle and made his way towards the flatbed. Agent Garcia instructed his partner to check inside the flatbed on the passenger's side. Agent Lopez then opened the rear, passenger's side door and withdrew a large blanket from the rear cabin. This revealed several cellophane-wrapped bundles stacked to the height of the vehicle's window frames. While Agent Lopez conducted the search, Agent Gomez arrived on the scene with a canine. The canine alerted to the presence of contraband. Defendants were arrested and charged with conspiring to possess and possessing with intent to distribute marijuana.

**II. Discussion**

Defendants contend that the traffic stop was an unlawful seizure under the Fourth Amendment. The legality of a traffic stop is analyzed under the two-pronged framework established in *Terry v. Ohio*, 392 U.S. 1 (1968). *See United States v. Sharpe*, 470 U.S. 675 (1985). Defendants challenge the legality of the stop at its inception, arguing that it was not supported by reasonable suspicion as informed by the factors for evaluating the validity of roving patrol stops articulated in *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975). They also argue that the agents' actions during the course of the stop impermissibly prolonged the detention. The Government takes the position that the stop was supported by reasonable suspicion based in part on the license plate report indicating that the flatbed bore false license plates. Dkt. No. 34 at 8. The

Government also argues that the stop was not impermissibly prolonged. The Court will discuss each of the *Terry* prongs in turn.

**A. The initial stop**

Border Patrol agents on roving patrol may temporarily detain a vehicle for investigatory purposes only if they are aware of specific articulable facts, together with rational inferences from those facts, warranting a reasonable suspicion to believe that the particular vehicle is involved in the transporting of contraband. *United States v. Rangel-Portillo*, 586 F.3d 376, 379 (5th Cir. 2009). Pursuant to *Brignoni-Ponce*, whether reasonable suspicion exists in the context of a roving patrol stop depends predominantly on the following factors: (1) proximity to the border; (2) the characteristics of the area in which the vehicle is encountered; (3) the usual traffic patterns; (4) the detaining agents' experience in detecting criminal activity; (5) information about recent illegal trafficking of aliens or narcotics in the area; (6) the aspects or characteristics of the vehicle; (7) the driver's behavior; and (8) the number of passengers and their appearance and behavior. *United States v. Olivares-Pacheco*, 633 F.3d 399, 402 (5th Cir. 2011). No single factor is dispositive. *United States v. Moreno-Chaparro*, 180 F.3d 629, 631–32 (5th Cir. 1998). Instead, the reasonable suspicion analysis looks to the totality of the circumstances. *Id.*

The Government argues the following circumstances in support of reasonable suspicion for the stop: the flatbed was encountered in close proximity to the border; the road where the stop occurred, Highway 83, is a notorious smuggling route; when the agents began to follow the flatbed, the

driver slowed down and looked back at the agents, which caused the flatbed to swerve; the flatbed appeared to the agents to be traveling in tandem with a dually; the flatbed was not typical of others in the area because it bore no company logo or equipment and was out on the highway past the usual hour for such vehicles; and the license plate report indicated that the flatbed bore false plates. Dkt. No. 34 at 5–8. Most of these circumstances add only little, if anything, in support of suspicion. Indeed, the validity of the stop at its inception hinges on whether the agents were entitled to rely on the erroneous license plate report, which stemmed from Agent Lopez's misreading of the license plate number.

Analysis begins with proximity to the border, which was decidedly close in this case. Proximity to the border is considered a "paramount factor" in assessing reasonable suspicion but only because proximity may suggest that a vehicle is coming from Mexico and thus more likely to carry contraband. *See United States v. Rivera-Gonzalez*, 413 F. App'x 736, 738 (5th Cir. 2011) (citing *United States v. Orozco*, 191 F.3d 578, 581 (5th Cir. 1999)). However, also to be considered in determining whether any inferences can be drawn as to a vehicle's origins is the presence of towns and roads between the border and location of the stop. *See United States v. Jones*, 149 F.3d 364, 368 (5th Cir. 1998) (citing *United States v. Melendez-Gonzalez*, 727 F.2d 407, 411 (5th Cir. 1984)).

Here, Highway 83 passes through several sizeable communities between the nearest border crossing south and the location of the stop, including

Zapata. This lessened the likelihood that the flatbed came from the border and carried contraband. *See United States v. Diaz*, 977 F.2d 163, 166 n.6 (5th Cir. 1992). Furthermore, Agent Garcia conceded that the agents had no information or evidence to believe that the flatbed came from the border. Where there is no reason to believe a vehicle came from the border, the remaining *Brignoni-Ponce* factors must be examined most carefully to ensure the stop complied with the Fourth Amendment. *See Orozco*, 191 F.3d at 581–82.

The Government argues that the stretch of Highway 83 where the stop occurred is notorious for alien and drug smuggling. A road's reputation as a route commonly used for transporting contraband may add to the reasonableness of suspicion. *Olivares-Pacheco*, 633 F.3d at 404. Without doubt, however, the vast majority of traffic along Highway 83 is lawful in nature. During the past year alone, Highway 83 and other local roads have seen a marked increase in traffic due to an explosion of oil and gas exploration in the area. Thus, despite the flatbed's presence on a border road frequently used by smugglers, such is insufficient to support a roving patrol stop. *Diaz*, 977 F.2d at 165. Otherwise, law enforcement would be free to stop any vehicle on virtually any road anywhere near the border with Mexico. *Id.*; *Rangel-Portillo*, 586 F.3d at 380.

When the agents began to follow the flatbed, they noted that the driver slowed and kept looking back at them, which caused the flatbed to swerve. "[N]oticeable deceleration in the presence of a patrol car can contribute to reasonable suspicion, even though drivers often slow when they see law

enforcement personnel." *United States v. Villalobos*, 161 F.3d 285, 291 (5th Cir. 1998). Furthermore, if a driver loses control of their vehicle due to preoccupation with the presence of a law enforcement officer, the driver's behavior may reinforce the officer's suspicion. *See Jones*, 149 F.3d at 370. But "when [an] officer's actions are such that any driver, whether innocent or guilty, would be preoccupied with his presence, then any inference that might be drawn from the driver's behavior is destroyed." *Id.*

Here, the driver of the flatbed only decelerated after Agent Garcia pulled close enough for Agent Lopez to read the license plate. Agent Garcia then dropped back by only a car length, at which point the driver turned around to look at the agents. These were the natural responses of any driver who finds they are being tailgated on a dark highway. *See id.* at 370–71. Thus, the driver's behavior adds only little to the reasonable suspicion analysis.

The agents testified that the flatbed seemed to be driving in tandem with a dually. A belief that two vehicles are traveling in tandem in a lead car and load car arrangement may contribute to reasonable suspicion. *See United States v. Delgado*, 99 F. App'x 493, 495 (5th Cir. 2004) (citing *United States v. Inocencio*, 40 F.3d 716, 720, 723 (5th Cir. 1994)). The Fifth Circuit "recognizes the load car-scout car pattern of travel, 'whereby two cars travel together during a smuggling venture with the first car operating primarily as a scout car.'" *United States v. Sanchez-Gonzalez*, 269 F. App'x 344, 347 (5th Cir. 2008) (quoting *United States v. Barnard*, 553 F.2d 389, 392 (5th Cir. 1977)). Typically, the scout car travels well ahead of the load car for purposes of

alerting the load car as to the presence of law enforcement. *See Sanchez-Gonzalez*, 269 F. App'x at 348; *see also Barnard*, 553 F.2d at 392 n.5. As Agent Garcia put it, the scout vehicle will act as a "decoy."

However, certain circumstances cut somewhat against the drawing of a load car-scout car inference. For one, the two vehicles traveled only one car length apart, which contradicted the agents' theory that one vehicle acted as a scout or decoy for the other. Indeed, "[r]easonable suspicion cannot result from the simple fact that two cars are traveling on a roadway . . . , one in front of the other, unless there are other 'connecting factors' to establish that their simultaneous travel could rationally be considered suspicions." *Rangel-Portillo*, 586 F.3d at 382 (citing *Melendez-Gonzalez*, 272 F.2d at 412). The Government does not point to any connecting factors here. Furthermore, the dually (which occupied the rear "load" car position according to the typical configuration) was pulled over by Agent Gomez and found not to be carrying contraband.[11] With the presumed load car empty, and the close proximity of the two vehicles, it was unlikely that the dually and flatbed were involved in a joint smuggling operation. Thus, the circumstance that the vehicles seemed to the agents to be driving in tandem contributes less to suspicion than generally warranted.

The Government argues that the flatbed itself was not typical of oilfield trucks in the area. The flatbed had no company logo on its side doors and did not carry any equipment. The flatbed was also out on the highway past the usual hour for such vehicles. In arguing that these characteristics support

[11] According to Agent Garcia, prior to pulling over the flatbed, the agents were informed by Agent Gomez that the dually was empty.

reasonable suspicion, the Government relies on *United States v. Inocencio*, 40 F.3d 716 (5th Cir. 1994) and *United States v. Nichols*, 142 F.3d 857 (5th Cir. 1998), both of which involved utility trucks without oil company logos.

However, the surrounding circumstances in *Inocencio* and *Nichols* rendered the trucks much more suspicious than the flatbed in the instant case. In *Inocencio*, agents encountered the truck on a ranch road authorized for use only by ranch employees, with whom the agents were already familiar, employees of a certain oil company, whose trucks the agents knew to bear company logos, and employees of a service company that, as the agents knew, only owned one Datsun truck. 40 F.3d at 720. In *Nichols*, the truck was unusually clean despite having traveled down a road that generally carried only light ranch traffic. 142 F.3d at 867–68.

Here, the flatbed was not encountered by the agents on some desolate road from nowhere. As the agents testified, traffic along Highway 83 was decidedly heavy even at the hour when the stop occurred. To be sure, the recent increase in oil and gas traffic along this road would involve trucks of all kinds, with and without logos, traveling at all hours of the day and night. Unlike the vehicles in *Inocencio* and *Nichols*, the flatbed could have been engaged in any sort of legitimate business. Thus, although the flatbed may have been atypical of area oilfield trucks, such adds only little to the reasonable suspicion analysis.

The Government is thus left with the report indicating that the flatbed bore false plates, which is a compelling circumstance considering that "a

'license plate switcheroo' is not uncommon in smuggling cases." *See United States v. De Leon-Reyna*, 930 F.2d 396, 401 (5th Cir. 1991) (en banc) (per curium). However, because the license plate report was erroneous, it must be determined as a threshold matter whether the report can be taken into account at all for purposes of the reasonable suspicion analysis. *See id.* at 399–400. This depends on whether the agents' reliance on the license plate report was objectively reasonable. *See id.* When examining whether an officer's judgment is objectively reasonable, the totality of the circumstances must be taken into account. *Id.* at 399 (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

Under the totality of the circumstances, an objective officer situated as the agents here could have reasonably relied on the license plate report. *See id.* at 400. Again, this erroneous report stemmed from Agent Lopez's misreading of the license plate number. However, there was little reason for the agents to have believed Agent Lopez made a mistake. The mistake itself was reasonable and involved two similar characters—a letter "I" for a number "1." *See United States v. Montes-Hernandez*, 350 F. App'x 862, 867–68 (5th Cir. 2009) (holding that officer's mistaken belief that issuing state's name on license plate was at least one-half obscured was reasonable, and, in the alternative, that officer's mistake of fact provided objective basis for reasonable suspicion). It was nighttime, and Agent Lopez read the plate off of a moving vehicle (while in a moving vehicle himself). Furthermore, the agents got close enough to the rear of the flatbed—less than a car length—so that they thought they could read the plate. Accordingly, although the license plate report turned out to be

erroneous, it may not be disregarded in determining whether there was reasonable suspicion to support the stop.[12] *See De Leon-Reyna*, 930 F.2d at 400.

The question remains whether the circumstances, when considered in their totality, supported reasonable suspicion to conduct the roving patrol stop of the flatbed. These determinations can often be difficult to make, even for jurists who have the benefits of hindsight and time for reflection. Thus, the Court is acutely cognizant of the unique task undertaken by Border Patrol agents in this particular region of the country, who must make their decisions, not from the comfort of an office, but from the field and in the heat of the moment. Yet, while their conclusions may be the result of a zealous desire to

---

[12] The Court notes the discrepancy in the agents' testimony regarding exactly when they discovered that Agent Lopez had misread the license plate number. According to Agent Garcia, the agents discovered the mistake after they activated their overhead lights but before the flatbed came to a stop. Agent Lopez testified that they discovered the mistake once the vehicles were stationary. However, this discrepancy does not affect whether the license plate report can be considered for purposes of the reasonable suspicion analysis. Whether there is reasonable suspicion to justify a stop depends on the facts available at the moment of seizure. *United States v. Smith*, 217 F.3d 746, 749 (9th Cir. 2000); *see United States v. Alvarez-Arriaga*, 43 F.3d 668, 668 (5th Cir. 1994) (per curium) (not selected for publication). "A seizure occurs either when a suspect is physically forced to stop or when the suspect submits to the officer's show of authority." *United States v. Hernandez*, 27 F.3d 1403, 1406 (9th Cir. 1994) (citing *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). The activation of a patrol unit's overhead lights constitutes a show of authority. *See United States v. Duarte-Hernandez*, 25 F. App'x 502, 505 (9th Cir. 2001); *see also United States v. Santamaria-Hernandez*, 968 F.2d 980, 982–83 (9th Cir. 1992). Here, the driver slowed the flatbed, exited the highway, and moved to the side of the road when the agents activated their overhead lights. The driver thus submitted to the show of authority and the seizure occurred before the agents discovered their mistake under either agent's version of the events. *See United States v. Griffith*, 762 F. Supp. 2d 1179, 1193 (D. Ariz. 2010) (driver of vehicle yielded to show of authority by immediately slowing and moving to side of the road).

secure our borders, the Court has the duty to ensure that those conclusions are reasonable under the Fourth Amendment. As discussed, most of the individual circumstances here would not seem to add much to the puzzle; but when pieced together with the license plate report, the entire picture presents one of reasonable suspicion. *See United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001) ("The reasonable suspicion analysis is a fact-intensive test in which the court looks at all circumstances together to weigh not the individual layers, but the laminated total."). Thus, it is the Court's conclusion that the Border Patrol agents here had reasonable suspicion to pull over the flatbed under the totality of the *Brignoni-Ponce* factors discussed above.[13]

The Court's ruling rests in no small part on a single digit. If Agent Lopez had not misread the letter "I" of the license plate number, the agents would not have received a report indicating the plates were false. And without this information, the other circumstances would likely not have amounted to reasonable suspicion. Mistakes of this sort might often be determined to be objectively reasonable given the field conditions involved in many Border Patrol

---

[13] As an alternative to its argument that the stop was supported by reasonable suspicion, the Government invokes the "good faith" exception to the exclusionary rule announced by the Supreme Court in *United States v. Leon*, 468 U.S. 897 (1984). Dkt. No. 47. However, because of doubts regarding its applicability, the Court will not address the good faith exception. *See United States v. Fields*, 380 F. App'x 400, 403 (5th Cir. 2010); *see also United States v. Maggitt*, 778 F.2d 1029, 1033 (5th Cir. 1985) (citing *Illinois v. Gates*, 462 U.S. 213, 264–65 (1983) (White, J., concurring)). The Fifth Circuit has noted that "the situation justifying application of the good faith exception to reasonable suspicion determinations has always involved circumstances extrinsic to the government agent's personal observations at the time of the stop." *Nichols*, 142 F.3d at 860 n.1. Here, however, the agents' mistake was *intrinsic*—wholly their own.

operations. That said, it is not enough that an agent's mistake be objectively reasonable. As a more fundamental matter, the agent must hold a good faith belief that a mistake was made. In other words, the claim that a mistake was made must actually be true. This is where the judge's role as a suppression hearing fact-finder comes into play. In fulfilling that role, the judge's duty, of course, is to determine the credibility of witnesses. And here, based on the agents' demeanor and the nature of their testimony, the Court has no doubt that Agent Lopez truly did misread the license plate number. In making this determination, the Court notes that the misreading of license plates by Border Patrol agents does not appear to be endemic (as informed by a review of roving patrol law). However, if it were to become more widespread, such could work to wear away at the credibility of similar claims in the future.

**B. Scope of the stop**

An officer's actions during the course of a stop must be reasonably related in scope to the circumstances that justified the stop of the vehicle in the first place. *United States v. Macias*, 658 F.3d. 509, 517 (5th Cir. 2011). This means that an officer may not detain a vehicle's occupants beyond the time needed to investigate the circumstances that caused the stop, unless reasonable suspicion of additional criminal activity develops in the meantime. *Id.* The relevant question in assessing whether a detention extends beyond a reasonable duration is whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.

*United States v. Brigham*, 382 F.3d 500, 511 (5th Cir. 2004) (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)) (quotations omitted).

Defendants argue that the stop was prolonged before consent to search was provided (and the cellophane-wrapped bundles were found) because "no additional circumstances that would give rise to probable cause to believe that Defendants were engaged in criminal activity arose after the Agents' [sic] satisfied themselves as to [Defendants'] citizenship." Dkt. No. 30 at 9.

However, the continued detention of Jones and Cates was warranted even after Agent Garcia was satisfied as to their citizenship. For one, other individuals could have been hiding in the flatbed. Furthermore, based on the circumstances discussed above and the agents' experience, the roving patrol stop was justified at its inception not just for suspected alien smuggling but for suspected *drug* smuggling as well. Regardless, Agent Garcia testified that during his immigration inspection, he detected the strong odor of air freshener, which would have supported suspicions of drug smuggling and the continued detention. *See United States v. Grier*, 127 F. App'x 712, 714–15 (5th Cir. 2005). Here, the agents were diligent in pursuing a means of investigation that was reasonably calculated to dispel their suspicions. For instance, Agent Lopez re-ran the correct license plate number to dispel the agents' belief that the plates were false, one of the circumstances that led to the stop in the first place. By

the time Agent Lopez received the correct return, Agent Garcia had obtained Jones' consent to search the flatbed.[14]

**III. CONCLUSION**

For these reasons, Defendants' Motion to Suppress (Dkt. No. 30) is DENIED.

IT IS SO ORDERED.

SIGNED this 16 day of April, 2012.

Marina Garcia Marmolejo
United States District Judge

[14] There is nothing in the record to suggest that Jones' consent was not voluntary. *See Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) (recognizing that voluntariness of consent to search depends on the totality of the circumstances).